IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

(SEATTLE)

FILED
LODGED
RECEIVED

**MAIL**

NOV 14 2019

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                              DEPUTY

WALLI MUJAHIDH

MOVANT,

V.                                      Case No. 2:11CR00228JLR-002

UNITED STATES OF AMERICA              **19-CV-1852 JLR**

RESPONDENT.


MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE, SET ASIDE, OR

CORRECT SENTENCE UNDER TITLE 28 U.S.C. §2255


Comes now, Walli Mujahidh, hereinafter the Movant ProSe, who most humbly and respectfully submits this Memorandum of Law in support of Motion to Vacate, Set Aside. or Correct Sentence under 28 U.S.C. §2255.


The Movant most humbly and respectfully asks this Honorable Court to construe his pleadings **"liberally"** pursuant to the doctrine of **"Haines v. Kerner,"** 404 U.S. 519, 520-21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) and **"broadly"** pursuant to the doctrine of **"Cruz v. Gomez"** 202 F.3d 593 (2nd Circuit 2000): "Courts must construe ProSe pleadings broadly, and interpret them to raise the strongest argument that they suggest" ("Pleadings must be construed as to do Justice").


"The care of human life and happiness, and not their destruction, is the **"first"** and **"only"** object of good government."

**President Thomas Jefferson**

- 1 -

The Supporting Facts expressed below involve a claim of **"Actual Innocence,"** see McQuiggin v. Perkins.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On April 8, 2013 the Movant was sentenced to 204 months to Counts One and Two; and 120 months as to Count 9, to run concurrently, after pleading guilty to the above charges of the Indictment: Conspiracy to murder officers and employees of the United States in violation to 18 U.S.C. §§1114(1) and 1117; Conspiracy to use weapons of mass destruction in violation to 18 U.S.C. §§2332a(a)(2)(C) and 2332a(a)(3); unlawful possession of firearms in violation to 18 U.S.C. §§922(g) and 2.

The Movant has timely submitted a Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. §2255, where he raised a claim of **"actual innocence"** under One Ground which shows the following:

## II. ARGUMENT

A: **GROUND ONE:** THE MOVANT IS **"ACTUALLY INNOCENT"** OF POSSESSING A
   FIREARM BY A CONVICTED FELON.

The Movant alleges in GROUND ONE of his Title 28 U.S.C. §2255 Motion that he is **'actually innocent"** because before **"Rehaif v. United States,"** the Government **"only"** had to prove a person charged with a §922(g) offense **"knew"** he possessed a firearm. The Government did not have to prove that the accused person **"knew"** that he belonged to the relevant category of persons barred from possessing firearms that made possession of a firearm illegal. **"Rehaif"** held that **"that was wrong"**- to obtain a conviction under §922(g), the Government **"now"**

has to prove **"both"** that a defendant **"knew"** he possessed a firearm, **"and"** that he **"knew"** he belonged to the relevant category of persons barred from possessing firearms. Therefore, the **"same principle"** that governs over **"Rehaif v. United States"** applies to the Movant's conviction under Title 18 U.S.C. §922(g)(1) and §924(a)(2).

The Movant argues that his conviction must be vacated because the evidence presented by the Government at the time he plead guilty was insufficient to prove that he knew he was a convicted felon at the time he possessed the firearm. In addition, if the Movant's sufficiency-of-the-evidence challenge were evaluated according to the standard set forth in **"Rehaif,"** the evidence that the Government admitted would be inadequate to support his conviction. As Justice Breyer states in his opinion of the Supreme Court, "His behavior may instead be an innocent mistake to which criminal sanctions normally do not attach."

By the time of the Movant's arrest, he **"HAD NOT"** finished High School (see Exhibit A), therefore, if the Movant was illiterate (the Movant earned his G.E.D. while incarcerated), how could he understand the Science of Law which is more complex, especially if it has **"NOT"** been explained to him? Besides, the Movant **"DID NOT KNOW"** -and **"WAS NEVER TOLD"**- that the word **"knowingly"** in Title 18 U.S.C. §924(a)(2) applies **"both"** to the Movant's **"conduct"** and to the Movant's **"status."** The Movant is therefore **"not guilty"** of this crime.

**"Knowingly"** means that the act was done **"voluntarily"** and **"intentionally,"** not because of mistake or accident. **"Knowledge"** on the part of the Movant **"CANNOT"** be established merely by demonstrating

that the Movant was in possession of a firearm, therefore, since the Government **"FAILED"** to prove the Movant's **"mens rea,"** his conviction on Count Nine must be **"VACATED."**

"It is necessary... to distinguish between producing a result intentionally and producing it **'knowingly.'"** "Because there are several areas of the Criminal Law in which there may be good reasons for distinguishing between one's **'objectives'** and one's **'knowledge,'** the modern approach is to define separately the mental states of **'knowledge'** and **'intent.'** ...this is the approach taken in the Model Penal Code [§2.02(2)(a) & (b)]" (Wayne R. LaFave & Austin W. Scott Jr., "Criminal Law" 218 (2nd ed. 1986)).

The matter of proving beyond a reasonable doubt that the Movant had a guilty state of mind **"REQUIRED"** by the statute's language and purpose of §922(g) and §924(a)(2) is paramount. Some may imply that a convicted felon receives a Judgement and Commitment and therefore **"should know"** that he/she is barred from possessing firearms. But this argument lacks logic, for it contains a **"FACT"** and a **"SUPPOSITION."** Who can **"ASSURE"** that the convicted felon has read the Judgement and Commitment, or evenmore, **"ASSURE"** that he/she understands what he/she read, especially when being illiterate? (see Exhibit A) That is like saying a person **"ASSUMES"** he/she knows how to use a certain appliance he/she just bought simply because he/she owned a previous model and therefore, does not need to read the owner's manual.

"Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), emplyment

history, lack of guidance as a youth, family ties, or military, civic charitable, or public services **"ARE NOT"** ordinarily considered under the Guidelines (see U.S.S.G. Manual §5H1. 1-6, 11 and 12 (Nov 2006)). These are, **"HOWEVER,"** matters that §3553(a) authorizes the Sentencing Judge to consider (see 18 U.S.C. §3553(a)(1)). As such, they are factors that an appellate court must consider under... [the] abuse-of-discretion standard (see Rita v. United States, 551 U.S. 338, 168 L. Ed. 2d 203).

Roper v. Simmons, 543 U.S. 551, 559, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), quotes a study stating that a lack of maturity and undeveloped sense of responsibility are qualities that **"often result in impetuous and ill-considered actions."**

In Gall v. United States, the District Judge clearly stated the relevance of these studies in the opening and closing sentences of the footnote: "Immaturity at the time of the offense conduct is not an incosequential consideration. Recent studies on the development of the human brain **"CONCLUDE"** that human brain development may not become complete until the age of twenty five (25). ...the recent (National Institute of Health) report **"confirms"** that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a Sentencing Court should account for age when inquiring into the **"CONDUCT"** of a defendant." Id. at 552 U.S. 38 (See exhibit B).

For all of the above, though in an adult body, District Courts may be **"sentencing children"** to serve time in prison with real adult criminals who may **"WORSEN"** the condition of the former, depriving

them of useful, productive life, after serving their time in prison.

This is a **"CRUCIAL ELEMENT"** which Congress Has the responsibility
to solve. Perhaps Congress should order State and Federal Judges to
tell the defendant, during sentencing, that he/she is barred from
possessing firearms, and **"MAKING SURE"** that the defendant **"UNDERSTANDS"**
that from that very moment forward, he/she belongs to the relevant
category of persons barred from possessing firearms, for once there
exists a written Court record (transcripts), that say that the
defendant **"knew,"** for he/she was told and understood, that he/she
belonged to the relevant category of persons barred from possessing
firearms, then the **"status element"** (cf. Illegal alien, convicted
felon, etc.) will be **"satisfied"** and the convictin for **"knowingly"
violating"** the statutes of  §922(g) and §924(a)(2) will be **"innevitable."**
Just because the statute lists a category of persons barred from
possessing a firearm **"DOES NOT"** prove **"knowledge"** of violating the
statute's elements, and therefore, it **"CANNOT"** be self-satisfied.
The Law is satisfied by **"FACTS"** not assumptions.

FACT. 1• Something that actually exists; an aspect of reality <it
is a fact that all people are mortal>. •FACTS include not just tangible
things, actual accurances, and relationships, **"but also states of
mind such as intentions and holding of opinions."** 2• An actual or
alleged event or circumstance, as distinguished from its legal effect,
consequence, or interpretation <the Jury made a finding or fact>
(Black's Law Dictionary).

SUPPOSITION. An **"assumption"** that something is true, **"without

**proof"** of its veracity; the act of supposing (ibid).

### III. CONCLUSION

To convict a defendant under Title 18 U.S.C. §922(g) and §924(a)(2), the Government therefore must prove that the defendant **"knew"** he/she possessed a firearm **"AND ALSO"** that the defendant **"knew"** he/she had the relevant status when he/she possessed it.

By specifying that a defendant may be convicted **"ONLY"** if he/she **"knowingly violated"** 18 U.S.C. §922(g), Congress intended to require the Government to establish that a defendant **"knew"** he/she violated the **"material elements"** of Title 18 U.S.C. §922(g).

In conclusion, in a prosecution under 18 U.S.C. §922(g) and §924 (a)(2), the Government **"must prove"** beyond a reasonable doubt **"both"** that the defendant **'knew'** he/she possessed a firearm **"AND"** that he/she **"knew"**he/she belonged to the relevant category of persons barred from possessing a firearm.

For a thorough analysis on the Movant's **"Supporting Facts,"** see the attached Exhibit C (The opinion of the United States Supreme Court regarding **"violating"** Title 18 U.S.C. §922(g) and §924(a)(2) by Justice Breyer).

Finally, for all of the above, the Movant (Walli Mujahidh) most humbly and respectfully requests Honorable Judge James L. Robart to consider the §3553 factors and the apology that he presents in **EXHIBIT D**, as the Honorable Court makes its decision in the Movant's case.

**The** Movant closes his petition quoting the words of Honorable United States District Judge, Alvin K. Hellerstein, from his opinion 2005 U.S. Dist. Lexis 3076: "Rehanilitation is also a goal of punishment, 18 U.S.C. §3553(a)(D), that a goal **"CANNOT"** be served if a defendant can look forward to nothing beyond imprisonment. **"HOPE"** is the necessary condition of mankind, for we are all created in the image of GOD. A judge should be hesitant before sentencing so severely that he **"DESTROYS ALL HOPE"** and **"TAKES ALL POSSIBILITY OF USEFUL LIFE."** Punishment should not be more severe that that necessary to satisfy the goals of punishment." The Honorable Judge's words came when sentencing a defendant that could have been sentenced as a career offender, and was facing a sentence of 262 to 327 months, and the Honorable Judge found that a punishment of 168 months was a just punishment.

Respectfully Submitted,

November 12th, 2019     Walli Mujahidh

Reg. No. 40738-086

## IV. VERIFICATION

I, Walli Mujahidh, hereby verify that the information provided herein is true and accurate to the best of my knowledge under penalty of perjury Title 28 U.S.C. §1746; Title 18 U.S.C. §1621.

November 12th, 2019     Walli Mujahidh

Reg. No. 40738-086

FCI Estill

P.O. Box 699

Estill, SC 29918

## V. CERTIFICATE OF SERVICE

I, Walli Mujahidh, hereby certify that on November 12th, 2019, a true and correct copy of the foregoing was deposited in the Prison Legal Mailing System addressed to:

    Assistant United States Attorney

    Michael Dion / Todd Greenberg

    700 Stewart Street, Suite 5220

    Seattle, WA 98101

Executed on thyis November 12th, 2019

                                      Walli Mujahidh
Reg. No. 40738-086
FCI Estill
P.O. Box 699
Estill, SC 29918

EXHIBIT A

PSI/PSR

EDUCATIONAL AND VOCATIONAL SKILLS

### Education and Vocational Skills

93.     The defendant attended elementary and middle school in Pomona, California. He advised being suspended a couple of times in elementary school for "average kid stuff," such as fighting and arguing. He has never been diagnosed with a learning disability and described himself as "a pretty smart kid."

94.     From 1994 to 1996, he attended Pomona High School, but left school without a diploma (verified). He explained, "I dropped out in the 11th grade. My dad put me out. I also had my son and started to work." Mujahidh was on the high school track and field team.

### Employment Record

95.     The defendant reported limited and sporadic employment history. At the time of his arrest in this matter, he was selling candles and incense on the streets of Los Angeles and earning approximately $40 a day. He identified "customer service" as his usual occupation.

96.     From 2002 until 2007, and again from 2008 until 2011, the defendant was unemployed and receiving $740 a month in Social Security Disability Insurance (SSI) benefits.

97.     From 2007 until 2008, the defendant was reportedly employed at Bally Building Maintenance in Seattle, Washington, and earned $10 an hour. It was here that Mujahidh reported meeting Abdul-Latif. The defendant advised leaving this position to return to southern California. Verification of employment was requested but not received.

98.     For a brief time in 2007, the defendant was reportedly employed at Jack-in-the-box in Seattle and earned minimum wage. With regard to why the employment ended, he said, "I left town. It was not a good job." Correspondence received from this company failed to verify the defendant's employment.

99.     For approximately two weeks in "1998 or 1999," the defendant was reportedly employed at Macy's in Los Angeles and earned minimum wage. He was terminated for stealing. Verification of employment was requested but not received.

100.    For two days in 1996, the defendant reportedly worked as a cashier at Carl's Junior in Mountclair, California, and earned minimum wage. He was reportedly terminated because his cash drawer was short $300.

### Military Record

101.    None.

EXHIBIT B

PSI/PSR

PHYSICAL & MENTAL

76.     The defendant's family is aware of his arrest in this matter. He described their response as "shocked." Mujahidh further stated, "My mother and sister are very sad and shocked. The press came to my mom's house. It is not in my character to be violent. I have no violence in my record."

77.     Ms. Domingue was telephonically interviewed and corroborated the above-noted personal and family history. She identified the defendant as her "son" and advised they do not use the term "stepmother" or "stepson" in her home. With regard to Mujahidh's criminal conduct, she stated, "I was horrified. It is so out of character for him. He is a loving and giving person. He would feed the homeless and give them all his money." Ms. Domingue also explained, "He is a follower. He knows he is different and just tries to fit in. It was just stupid. I told him to follow his own mind. He knows it was stupid." She further expects her son will be released from prison one day and return to southern California to be near her. They continue to nurture their relationship and speak monthly.

78.     Mujahidh understands that his is facing a significant sentence in this matter. During his term of incarceration he plans to earn a GED, learn a skill or trade, and become a productive member of society. He would like to study to be a barber or a nurse. The defendant also plans to seek counseling for his mental health issues, depression, and drug addiction.

79.     Upon his release from custody, the defendant plans to return to California and reunite with his family. He also intends to continue mental health counseling and follow any recommended medication regimen. Mujahidh acknowledged that he will require transitional support, including assistance with housing and employment.

**Physical Condition**

80.     The defendant stands 5'7" tall, weighs 220 pounds, has brown eyes, and brown hair. He reported having a scar on his right calf and on his right bicep; the result of childhood injuries. Mujahidh identified three tattoos, including the following: 'Squad Nigga' on his left bicep; 'Priscilla' on the inside of his right forearm; and 'Domingue' on the right side of his chest. He denied any gang affiliation.

81.     Mujahidh described his overall physical health as "fair." He reported having seizures since he fell in 1995 and suffered a brain hemorrhage. The defendant also described the effects of his long-term incarceration in segregation and said, "I can't exercise and it is hard to handle." He is currently prescribed Zyprexa to treat schizophrenia and Depakote to treat bipolar disorder. The defendant's mother corroborated his overall good health.

**Mental and Emotional Health**

82.     The defendant has a lengthy and documented mental health history. His psychiatric treatment history is detailed in voluminous records that begin in the late 1990's, which the probation officer has reviewed. He received various diagnoses over time, but most providers

15

have opined that Mujahidh has schizoaffective disorder.  He has also frequently been diagnosed with bipolar disorder, but the latest information available suggests that his symptoms are more consistent with schizoaffective disorder, bipolar type.  The defendant is currently prescribed Geodon and Depakote.

83.   The earliest records available indicate he was treated at Tri-City Mental Health Center in Pomona beginning in August 1998. Mujahidh estimated he has been psychiatrically hospitalized approximately 18 times.  His verified hospitalizations include the following: Pomona Valley Medical Center in February 1999; at least six inpatient admissions to Riverside County Regional Medical Center between January 2000 and March 2006; Adventist Medical Center in Portland, Oregon, in July 2008; two weeks inpatient treatment at Harborview Medical Center in August 2008; Del Amo Behavioral Health Center in Los Angeles in April 2009; and two hospitalizations at Physician's Behavioral Hospital in Shreveport, Louisiana, in 2010.  The majority of these admissions have been involuntary detentions for agitated and disorganized behavior accompanied by psychotic symptoms consistent with mania.  However, he has also had some hospitalization for depression and suicidal ideation.  The available records also document numerous emergency department visits for mood symptoms for which he was not admitted but given referrals for outpatient services.

84.   Between psychiatric hospitalizations, Mujahidh has received outpatient treatment through numerous mental health facilities in various parts of the country.  He has been treated with several different psychotropic medications over the years and has received psychotherapy from multiple providers. Most of his psychotherapy was focused on maintaining medication compliance and supportive psychotherapy focused on augmenting his limited coping abilities and helping him deal with social issues arising from his homelessness, relationship issues, and legal problems.

85.   The defendant's compliance with treatment has been sporadic.  Outpatient providers have noted varying levels of insight.  He was noted to be symptomatic much of the time with irritability, grandiosity, and psychotic symptoms.  Mujahidh's treatment has been disrupted by poor compliance with his medication regimen, drug use, and frequently dropping out of treatment.  The defendant indicated he would often quit taking his medications because of side effects, concerns about consequences of psychotropic drugs on his health, or because he would simply "feel better."

86.   Mujahidh indicated he was relatively stable in his outpatient treatment at Augustus F. Hawkins Mental Health Center in Los Angeles in the months prior to his arrest.  He identified Dr. George Akpeny as his treatment provider.  However, the defendant also admitted that in reality, he was only intermittently compliant with his medication regimen as has been the case for the previous twenty years.

16

87.    During the presentence interview, the defendant appeared to have insight into his mental health issues and advised he is committed to treatment and a medication regimen in the future. He stated, "I stopped taking my meds periodically. My family tried to help. When I was interrogated in this case I was off my meds and had been off them for one or two months. They made me feel groggy and out of it. I was lethargic. I don't like to feel sedated all the time." With regard to seeking treatment, Mujahidh advised he would often call 911 himself. He explained, "I would start hearing voices. I could feel symptoms coming on." The defendant indicated he is willing to participate in mental health counseling. He stated, "It would help me resolve some current issues."

88.    Ms. Domingue corroborated the above-noted information regarding her son's history of mental illness. She disclosed early signs of trouble in the defendant's life and advised seeking help for him at Child Haven when he was just three years old. She reported some disturbing behaviors, including opening the door of a moving vehicle, pouring water on the floor for no reason, and locking the family out of the house." Ms. Domingue described her son as "very smart," but he exhibited signs of defiance at an early age. As an adult, he "talked about weird stuff" and "would mumble to himself." She denied ever feeling fearful of her son.

### Substance Abuse

89.    The defendant advised he first consumed alcohol at the age of 14. However, he described his recent level of use as "not often" and "socially."

90.    Mujahidh indicated he has been a regular user of marijuana since he first used the substance at the age of 14. He reported smoking "four ½ gram blunts" per day. The defendant identified marijuana as his drug of choice and the drug that has caused him to experience to most negative consequences. Mujahidh advised he was not under the influence of marijuana at the time of his arrest. He denied ever using powder cocaine.

91.    Various mental health evaluations have also included comments regarding the defendant's use of drugs and alcohol. He has been diagnosed with alcohol, marijuana, and cocaine abuse; not dependence. Mujahidh reported living at Gibson House in San Bernadino, California, in 2004 and 2005 and completing a 90-day inpatient substance abuse program. Also during 2004 and/or 2005, the defendant reportedly failed to complete a different 90-day inpatient treatment program at the Salvation Army in Riverside. He explained, "I only did 30 days and I left. It was court-ordered. I was on probation for a theft." Mujahidh advised he is committed to addressing his chemical dependency issues and is willing to participate in substance abuse treatment.

92.    Ms. Domingue had no information regarding her son's drug and alcohol use. She said, "Oh no. That did not go on in my house." She also described the defendant's father as a heavy drinker. She stated, "He wasn't violent, but he liked to go driving around. That's one of the reasons I left. I was not going to put myself in that situation."

EXHIBIT C

THE OPINION OF THE UNITED STATES SUPREME COURT

REGARDING VIOLATING TITLE 18 U.S.C. §922(g) and §924(a)(2)

BY JUSTICE BREYER

Justice Breyer delivered the opinion of the Court.

A federal statute, 18 U. S. C. §922(g), provides that ``[i]t shall be unlawful'' for certain individuals to possess firearms. The provision lists nine categories of individuals subject to the prohibition, including felons and aliens who are ``illegally{2019 U.S. LEXIS 5} or unlawfully in the United States.'' *Ibid*. A separate provision, §924(a)(2), adds that anyone who ``*knowingly* violates'' the first provision shall be fined or imprisoned for up to 10 years. (Emphasis added.)

The question here concerns the scope of the word ``knowingly.'' Does it mean that the Government must prove that a defendant knew both that he engaged in the relevant conduct (that he possessed a firearm) and also that he fell within the relevant status (that he was a felon, an alien unlawfully in this country, or the like)? We hold that the word ``knowingly'' applies both to the defendant's conduct and to the defendant's status. To convict a defendant, the Government therefore must show that the defendant knew he possessed a firearm and also that he knew he had the relevant status when he possessed it.

I

Petitioner Hamid **Rehaif** entered the United States on a nonimmigrant student visa to attend university. After he received poor grades, the university dismissed him and told him that his ```immigration status''' would be terminated unless he transferred to a different university or left the country. App. to Pet. for Cert. 3a. **Rehaif** did neither.

**Rehaif** subsequently visited a firing range, where he shot{2019 U.S. LEXIS 6} two firearms. The Government learned about his target practice and prosecuted him for possessing firearms as an alien unlawfully in the United States, in violation of §922(g) and §924(a)(2). At the close of Rehaif's trial, the judge instructed the jury (over Rehaif's objection) that the ``United States is not required to prove'' that **Rehaif** ``knew that he was illegally or unlawfully in the United States.'' App. to Pet. for Cert. 4a (internal quotation marks omitted). The jury returned a guilty verdict, and **Rehaif** was sentenced to 18 months' imprisonment.

{139 S. Ct. 2195} **Rehaif** appealed. He argued that the judge erred in instructing the jury that it did not need to find that he knew he was in the country unlawfully. The Court of Appeals for the Eleventh Circuit, however, concluded that the jury instruction was correct, and it affirmed Rehaif's conviction. See 888 F. 3d 1138, 1148 (2018). The Court of Appeals believed that the criminal law generally does not require a defendant to know his own status, and further observed that no court of appeals had required the Government to establish a defendant's knowledge of his status in the {204 L. Ed. 2d 600} analogous context of felon-in-possession prosecutions. *Id.*, at 1145-1146.

We granted certiorari to consider whether, in prosecutions under{2019 U.S. LEXIS 7} §922(g) and §924(a)(2), the Government must prove that a defendant knows of his status as a person barred from possessing a firearm. We now reverse.

II

Whether a criminal statute requires the Government to prove that the defendant acted knowingly is a question of congressional intent. See *Staples* v. *United States*, 511 U. S. 600, 605, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994). In determining Congress' intent, we start from a longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding ``each of the statutory elements that criminalize otherwise innocent conduct.'' *United States* v. *X-Citement Video, Inc.*, 513 U. S. 64, 72, 115 S. Ct. 464, 130 L. Ed. 2d 372 (1994); see also *Morissette* v. *United States*, 342 U. S. 246, 256-258, 72 S. Ct. 240, 96 L. Ed. 288 (1952). We normally characterize this interpretive maxim as a presumption in favor of ``scienter,'' by which

SCTHOT                                                    1

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

40738086

we mean a presumption that criminal statutes require the degree of knowledge sufficient to ``mak[e] a person legally responsible for the consequences of his or her act or omission.'' Black's Law Dictionary 1547 (10th ed. 2014).

We apply the presumption in favor of scienter even when Congress does not specify any scienter in the statutory text. See *Staples*, 511 U. S., at 606, 114 S. Ct. 1793, 128 L. Ed. 2d 608. But the presumption applies with equal or greater force when Congress includes a general scienter provision in the statute itself. See ALI, Model Penal Code §2.02(4), p. 22 (1985) (when a statute ``prescribes the kind of culpability**{2019 U.S. LEXIS 8}** that is sufficient for the commission of an offense, without distinguishing among the material elements thereof, such provision shall apply to all the material elements of the offense, unless a contrary purpose plainly appears'').

A

Here we can find no convincing reason to depart from the ordinary presumption in favor of scienter. The statutory text supports the presumption. The text of §924(a)(2) says that ``[w]hoever knowingly violates'' certain subsections of §922, including §922(g), ``shall be'' subject to penalties of up to 10 years' imprisonment. The text of §922(g) in turn provides that it ``shall be unlawful for any person . . ., being an alien . . . illegally or unlawfully in the United States,'' to ``possess in or affecting commerce, any firearm or ammunition.''

The term ``knowingly'' in §924(a)(2) modifies the verb ``violates'' and its direct object, which in this case is §922(g). The proper interpretation of the statute thus turns on what it means for a defendant to know that he has ``violate[d]'' §922(g). With some here-irrelevant omissions, §922(g) makes possession of a firearm or ammunition unlawful when the following elements are satisfied: (1) a status element (in this case, ``being an alien . . . illegally **{139 S. Ct. 2196}** or unlawfully in the United States''); (2) a**{2019 U.S. LEXIS 9}** possession element (to ``possess''); (3) a jurisdictional element (``in or affecting commerce''); and (4) a firearm element (a ``firearm or ammunition'').

**{204 L. Ed. 2d 601}** No one here claims that the word ``knowingly'' modifies the statute's jurisdictional element. Jurisdictional elements do not describe the ``evil Congress seeks to prevent,'' but instead simply ensure that the Federal Government has the constitutional authority to regulate the defendant's conduct (normally, as here, through its Commerce Clause power). *Luna Torres* v. *Lynch*, 578 U. S. ___, ___-___, 136 S. Ct. 1619, 194 L. Ed. 2d 737, 758 (2016). Because jurisdictional elements normally have nothing to do with the wrongfulness of the defendant's conduct, such elements are not subject to the presumption in favor of scienter. See *id.*, at ___, 136 S. Ct. 1619, 194 L. Ed. 2d 737 (slip op., at 16).

Jurisdictional element aside, however, the text of §922(g) simply lists the elements that make a defendant's behavior criminal. As ``a matter of ordinary English grammar,'' we normally read the statutory term ``'knowingly' as applying to all the subsequently listed elements of the crime.'' *Flores-Figueroa* v. *United States*, 556 U. S. 646, 650, 129 S. Ct. 1886, 173 L. Ed. 2d 853 (2009); see also *id.*, at 652, 129 S. Ct. 1886, 173 L. Ed. 2d 853 (we ``ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element''). This is notably not a case where the modifier ``knowingly'' introduces**{2019 U.S. LEXIS 10}** a long statutory phrase, such that questions may reasonably arise about how far into the statute the modifier extends. See *id.*, at 659, 129 S. Ct. 1886, 173 L. Ed. 2d 853 (Alito, J., concurring in part). And everyone agrees that the word ``knowingly'' applies to §922(g)'s possession element, which is situated after the status element. We see no basis to interpret ``knowingly'' as applying to the second §922(g) element but not the first. See *United States* v. *Games-Perez*, 667 F. 3d 1136, 1143 (CA10 2012) (Gorsuch, J., concurring). To the contrary, we think that by specifying that a defendant may be convicted only if he ``knowingly violates'' §922(g), Congress intended to require

SCTHOT                                                    2

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

40738086

the Government to establish that the defendant knew he violated the material elements of §922(g).

B

Beyond the text, our reading of §922(g) and §924(a)(2) is consistent with a basic principle that underlies the criminal law, namely, the importance of showing what Blackstone called ``a vicious will.'' 4 W. Blackstone, Commentaries on the Laws of England 21 (1769). As this Court has explained, the understanding that an injury is criminal only if inflicted knowingly ``is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.'' *Morissette*, 342 U. S., at 250, 72 S. Ct. 240, 96 L. Ed. 288. Scienter requirements{2019 U.S. LEXIS 11} advance this basic principle of criminal law by helping to ``separate those who understand the wrongful nature of their act from those who do not.'' *X-Citement Video*, 513 U. S., at 72-73, n. 3, 115 S. Ct. 464, 130 L. Ed. 372.

The cases in which we have emphasized scienter's importance in separating wrongful from innocent acts are legion. See, *e.g.*, *id.*, at 70, 115 S. Ct. 464, 130 L. Ed. 372; *Staples*, 511 U. S., at 610; *Liparota* v. *United States*, 471 U. S. 419, 425, 105 S. Ct. {204 L. Ed. 2d 602} 2084, 85 L. Ed. 2d 434 (1985); *United States* v. *Bailey*, 444 U. S. 394, 406, n. 6, 100 S. Ct. 624, 62 L. Ed. 2d 575 (1980); *United States* v. *United States Gypsum Co.*, 438 U. S. 422, 436, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978); *Morissette*, 342 U. S., at 250-251, 72 {139 S. Ct. 2197} S. Ct. 240, 96 L. Ed. 288. We have interpreted statutes to include a scienter requirement even where the statutory text is silent on the question. See *Staples*, 511 U. S., at 605, 114 S. Ct. 1793, 128 L. Ed. 2d 608. And we have interpreted statutes to include a scienter requirement even where ``the most grammatical reading of the statute'' does not support one. *X-Citement Video*, 513 U. S., at 70, 115 S. Ct. 464, 130 L. Ed. 372.

Applying the word ``knowingly'' to the defendant's status in §922(g) helps advance the purpose of scienter, for it helps to separate wrongful from innocent acts. Assuming compliance with ordinary licensing requirements, the possession of a gun can be entirely innocent. See *Staples*, 511 U. S., at 611, 114 S. Ct. 1793, 128 L. Ed. 2d 608. It is therefore the defendant's *status*, and not his conduct alone, that makes the difference. Without knowledge of that status, the defendant may well lack the intent needed to make his behavior wrongful. His behavior may instead be an innocent mistake to which criminal sanctions normally do not attach. Cf. O. Holmes, The Common Law 3 (1881) (``even a dog distinguishes between{2019 U.S. LEXIS 12} being stumbled over and being kicked'').

We have sometimes declined to read a scienter requirement into criminal statutes. See *United States* v. *Balint*, 258 U. S. 250, 254, 42 S. Ct. 301, 66 L. Ed. 604, T.D. 3375 (1922). But we have typically declined to apply the presumption in favor of scienter in cases involving statutory provisions that form part of a ``regulatory'' or ``public welfare'' program and carry only minor penalties. See *Staples*, 511 U. S., at 606, 114 S. Ct. 1793, 128 L. Ed. 2d 608; *Morissette*, 342 U. S., at 255-259, 72 S. Ct. 240, 96 L. Ed. 288. The firearms provisions before us are not part of a regulatory or public welfare program, and they carry a potential penalty of 10 years in prison that we have previously described as ``harsh.'' *X-Citement Video*, 513 U. S., at 72, 115 S. Ct. 464, 130 L. Ed. 372. Hence, this exception to the presumption in favor of scienter does not apply.

III

The Government's arguments to the contrary do not convince us that Congress sought to depart from the normal presumption in favor of scienter.

The Government argues that Congress does not normally require defendants to know their own status. But the Government supports this claim primarily by referring to statutes that differ significantly from the provisions at issue here. One of these statutes prohibits ``an officer, employee,

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

40738086

contractor, or consultant of the United States" from misappropriating classified information. 18 U. S. C. §1924(a). Another statute applies to anyone ``at least eighteen{2019 U.S. LEXIS 13} years of age" who solicits a minor to help avoid detection for certain federal crimes. 21 U. S. C. §861(a)(2). A third applies to a ``parent [or] legal guardian" who allows his child to be used for child pornography. 18 U. S. C. §2251(b).

We need not decide whether we agree or disagree with the Government's interpretation of these statutes{204 L. Ed. 2d 603} . In the provisions at issue here, the defendant's status is the ``crucial element" separating innocent from wrongful conduct. *X-Citement Video*, 513 U. S., at 73, 115 S. Ct. 464, 130 L. Ed. 372. But in the statutes cited by the Government, the conduct prohibited-misappropriating classified information, seeking to evade detection for certain federal crimes, and facilitating child pornography-would be wrongful irrespective of the defendant's status. This difference assures us that the presumption in favor of scienter applies here even assuming the Government is right that these other statutes do not require knowledge of status.

Nor do we believe that Congress would have expected defendants under §922(g) and §924(a)(2) to know their own statuses. If the provisions before us were construed to require no knowledge of status, {139 S. Ct. 2198} they might well apply to an alien who was brought into the United States unlawfully as a small child and was therefore unaware of his unlawful status. Or these{2019 U.S. LEXIS 14} provisions might apply to a person who was convicted of a prior crime but sentenced only to probation, who does not know that the crime is ``*punishable* by imprisonment for a term exceeding one year." §922(g)(1) (emphasis added); see also *Games-Perez*, 667 F. 3d, at 1138 (defendant held strictly liable regarding his status as a felon even though the trial judge had told him repeatedly-but incorrectly-that he would ``leave this courtroom not convicted of a felony"). As we have said, we normally presume that Congress did not intend to impose criminal liability on persons who, due to lack of knowledge, did not have a wrongful mental state. And we doubt that the obligation to prove a defendant's knowledge of his status will be as burdensome as the Government suggests. See *Staples*, 511 U. S., at 615, n. 11, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (``knowledge can be inferred from circumstantial evidence").

The Government also argues that whether an alien is ``illegally or unlawfully in the United States" is a question of law, not fact, and thus appeals to the well-known maxim that ``ignorance of the law" (or a ``mistake of law") is no excuse. *Cheek* v. *United States*, 498 U. S. 192, 199, 111 S. Ct. 604, 112 L. Ed. 2d 617 (1991).

This maxim, however, normally applies where a defendant has the requisite mental state in respect to the elements of the crime but claims to be ``unaware of the existence{2019 U.S. LEXIS 15} of a statute proscribing his conduct." 1 W. LaFave & A. Scott, Substantive Criminal Law §5.1(a), p. 575 (1986). In contrast, the maxim does not normally apply where a defendant ``has a mistaken impression concerning the legal effect of some collateral matter and that mistake results in his misunderstanding the full significance of his conduct," thereby negating an element of the offense. *Ibid.*; see also Model Penal Code §2.04, at 27 (a mistake of law is a defense if the mistake negates the ``knowledge . . . required to establish a material element of the offense"). Much of the confusion surrounding the ignorance-of-the-law maxim stems from ``the failure to distinguish [these] two quite different situations." LaFave, Substantive Criminal Law §5.1(d), at 585.

We applied this distinction in *Liparota*, where we considered a statute that imposed criminal liability on ``whoever knowingly uses, transfers, {204 L. Ed. 2d 604} acquires, alters, or possesses" food stamps ``in any manner not authorized by the statute or the regulations." 471 U. S., at 420, 105 S. Ct. 2084, 85 L. Ed. 2d 434 (quotation altered). We held that the statute required scienter not only in respect to the defendant's use of food stamps, but also in respect to whether the food stamps were

SCTHOT                                                       4

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

40738086

used in a ``manner not authorized{2019 U.S. LEXIS 16} by the statute or regulations.'' *Id.*, at 425, n. 9, 105 S. Ct. 2084, 85 L. Ed. 2d 434. We therefore required the Government to prove that the defendant knew that his use of food stamps was unlawful-even though that was a question of law. See *ibid.*

This case is similar. The defendant's status as an alien ``illegally or unlawfully in the United States'' refers to a legal matter, but this legal matter is what the commentators refer to as a ``collateral'' question of law. A defendant who does not know that he is an alien ``illegally or unlawfully in the United States'' does not have the guilty state of mind that the statute's language and purposes require.

The Government finally turns for support to the statutory and legislative history. Congress first enacted a criminal statute prohibiting particular categories of persons from possessing firearms in 1938. See Federal Firearms Act, 52 Stat. 1250. {139 S. Ct. 2199} In 1968, Congress added new categories of persons subject to the prohibition. See Omnibus Crime Control and Safe Streets Act, 82 Stat. 197. Then, in 1986, Congress passed the statute at issue here, the Firearms Owners' Protection Act, 100 Stat. 449, note following 18 U. S. C. §921, which reorganized the prohibition on firearm possession and added the language providing that only those who violate the prohibition{2019 U.S. LEXIS 17} ``knowingly'' may be held criminally liable.

The Government says that, prior to 1986, the courts had reached a consensus that the law did not require the Government to prove scienter regarding a defendant's status. And the Government relies on the interpretive canon providing that when particular statutory language has received a settled judicial construction, and Congress subsequently reenacts that ``same language,'' courts should presume that Congress intended to ratify the judicial consensus. *Helsinn Healthcare S. A.* v. *Teva Pharmaceuticals USA, Inc.*, 586 U. S. ___, ___, 139 S. Ct. 628, 202 L. Ed. 2d 551, 559 (2019).

Prior to 1986, however, there was no definitive judicial consensus that knowledge of status was not needed. This Court had not considered the matter. As the Government says, most lower courts had concluded that the statute did not require knowledge of status. See, *e.g.*, *United States* v. *Pruner*, 606 F. 2d 871, 874 (CA9 1979). But the Sixth Circuit had held to the contrary, specifically citing the risk that a defendant ``may not be aware of the fact'' that barred him from possessing a firearm. *United States* v. *Renner*, 496 F. 2d 922, 926 (1974). And the Fourth Circuit had found that knowledge of a defendant's status was not needed because the statute ``[b]y its terms'' did not require knowledge of status. *United States* v. *Williams*, 588 F. 2d 92 (1978) (*per curiam*).

This last-mentioned circumstance is important. Any pre-1986 consensus involved the statute{2019 U.S. LEXIS 18} as it read prior to 1986-without any explicit scienter provision. But Congress in 1986 added a provision clarifying that a {204 L. Ed. 2d 605} defendant could be convicted only if he violated the prohibition on firearm possession ``knowingly.'' This addition, which would serve no apparent purpose under the Government's view, makes it all but impossible to draw any inference that Congress intended to ratify a pre-existing consensus when, in 1986, it amended the statute.

The Government points to the House Report on the legislation, which says that the 1986 statute would require the Government to prove ``that the defendant's *conduct* was knowing.'' H. R. Rep. No. 99-495, p. 10 (1986) (emphasis added). Although this statement speaks of ``conduct'' rather than ``status,'' context suggests that the Report may have meant the former to include the latter. In any event, other statements suggest that the word ``knowingly'' was intended to apply to both conduct and status. The Senate Report, for example, says that the proposed amendments sought to exclude ``individuals who lack all criminal intent and knowledge,'' without distinguishing between conduct and status. S. Rep. No. 97-476, p. 15 (1982). And one Senate sponsor of the{2019 U.S. LEXIS 19} bill pointed out that the absence of a scienter requirement in the prior statutes had resulted in ``severe

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

40738086

penalties for unintentional missteps." 132 Cong. Rec. 9590 (1986) (statement of Sen. Hatch).

Thus, assuming without deciding that statutory or legislative history could overcome the longstanding presumption in favor of scienter, that history here is at best inconclusive.

\*\*\*

**{139 S. Ct. 2200}** The Government asks us to hold that any error in the jury instructions in this case was harmless. But the lower courts did not address that question. We therefore leave the question for those courts to decide on remand. See *Thacker* v. *TVA*, 587 U. S. ___, ___, 139 S. Ct. 1435, 203 L. Ed. 2d 668, 678 (2019)) (citing *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005)).

We conclude that in a prosecution under 18 U. S. C. §922(g) and §924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm. We express no view, however, about what precisely the Government must prove to establish a defendant's knowledge of status in respect to other §922(g) provisions not at issue here. See *post*, at 13–15 (Alito, J., dissenting) (discussing other statuses listed in §922(g) not at issue here). We accordingly reverse the judgment of the Court of Appeals and remand the case for further **{2019 U.S. LEXIS 20}** proceedings consistent with this opinion.

*It is so ordered.*

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

40738086

EXHIBIT D

§3553 FACTORS & APOLOGY



## Summary Reentry Plan - Progress Report

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: MUJAHIDH, WALLI 40738-086

**SEQUENCE: 00132446**
**Report Date: 09-19-2019**



| | | | |
|---|---|---|---|
| Facility: | EST ESTILL FCI | Custody Level: | IN |
| Name: | MUJAHIDH, WALLI | Security Level: | MEDIUM |
| Register No.: | 40738-086 | Proj. Rel Date: | 05-30-2026 |
| Quarters: | D04-414U | Release Method: | GCT REL |
| Age: | 40 | DNA Status: | SET03577 / 06-22-2011 |
| Date of Birth: | 10-17-1978 | | |

### Contact Information

**Release contact & address**
Brenda Dickson, MOTHER
2151 Citrus Hills Ave. #1145, Las Vegas, NV 89106
US
phone (home) : 706-596-1954

### Offenses and Sentences Imposed

| Charge | Terms In Effect |
|---|---|
| 18:1114(1)AND 1117 CONSPIRACY TO MURDER OFFICERS AND EMPLOYEES OF THE UNITED STATES (CT1) 18:2332A(A)2)(C)AND2332A(A)(3) CONSPIRACY TO USE WEAPONS OF MASS DESTRUCTION (CT2) 18:922(G)(1)AND 2 UNLAWFUL POSSESSION OF FIREARMS (CT9) | 204 MONTHS |

Date Sentence Computation Began:    04-08-2013

Sentencing District:    WASHINGTON, WESTERN DISTRICT

| Days FSGT / WSGT / DGCT | Days GCT or EGT / SGT | Time Served | + Jail Credit  - InOp Time |
|---|---|---|---|
| 0 /   0 /  54 | 378 | Years: 8 Months: 2 Days: 29 | + 656   JC  - 0    InOp |

### Detainers

| Detaining Agency | Remarks |
|---|---|
| NO DETAINER | |

### Program Plans

He arrived on 10-31-2017 as a transfer in.

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| EST | FS 2 | FOOD SERVICE PM SHIFT | 04-15-2019 |

### Work Assignment Summary

He works in food service as a dishwasher.  He has worked as a baker in food service as well.  He received good work evaluations.

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| EST | ESL HAS | ENGLISH PROFICIENT | 06-25-2013 |
| EST | GED EARNED | GED EARNED IN BOP | 12-18-2014 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| EST | W | FCI LEATHER T/TH 8-10 AM PG#6 | 02-13-2019 | 02-13-2019 |
| EST | C | INSIDE OUT DAD TH 9-10:30(#6) | 09-05-2018 | 01-16-2019 |
| EST | C | COMM DRIVERS LICENSE (EM#2) | 12-10-2018 | 01-16-2019 |
| EST | C | FCI ADVANCE CROCHET | 07-10-2018 | 09-28-2018 |
| EST | C | BARBER-INFECTION CONTROL #2,6 | 07-03-2018 | 08-29-2018 |
| EST | C | SERVSAFE  FCI 12-2PM #6 | 05-31-2018 | 07-26-2018 |
| EST | C | CROCHETING S/S 12-1 PM | 07-10-2018 | 07-10-2018 |
| EST | C | NCCER CORE CONST.0730-9A(PG#6) | 10-03-2017 | 08-01-2018 |
| EST | C | CROCHETING S/S 12-1 PM | 02-19-2018 | 05-20-2018 |



## Summary Reentry Plan - Progress Report

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: MUJAHIDE, WALLI  40738-086

SEQUENCE: 00132446
Report Date: 09-19-2019

| SubFacl | Action | Description | Start | Stop |
|---------|--------|-------------|-------|------|
| EST | C | SPANISH I (PG 6) | 02-06-2018 | 04-24-2018 |
| EST | C | INFECTIOUS DISEASE PREVT(HN#1) | 11-21-2017 | 11-21-2017 |
| FLP | C | SHU FOSSIL | 10-10-2017 | 10-17-2017 |
| FLP | C | SHU SOLAR SYSTEM | 09-25-2017 | 10-04-2017 |
| FLP | C | SHU FINANCIAL RECOVERY | 09-11-2017 | 09-20-2017 |
| FLP | C | SHU PARENTING RELATIONSHIP | 07-31-2017 | 08-08-2017 |
| FLP | C | HISTORY OF US PART 4 | 07-10-2017 | 07-24-2017 |
| FLP | C | SHU CONVERSATIONAL SPANISH 5 | 06-30-2017 | 07-10-2017 |
| FLP | C | SHU FOOD LABELS | 05-22-2017 | 06-01-2017 |
| FLP | C | SHU LOAN TO OWN | 04-03-2017 | 04-11-2017 |
| FLP | C | HISTORY OF US PART 2 | 03-20-2017 | 03-29-2017 |
| FLP | C | 7 HABITS ON THE INSIDE | 08-26-2016 | 10-27-2016 |
| FLP | C | BEG CROCHET | 06-12-2016 | 08-26-2016 |
| FLP | C | BEGINNING GUITAR CLASS | 09-08-2015 | 11-17-2015 |
| VVM | C | SHU-ACE WRITING SKILLS | 05-31-2015 | 08-03-2015 |
| VVM | C | SHU-ACE SOCIAL STUDIES | 05-31-2015 | 08-03-2015 |
| VVM | C | SHU-ACE SCIENCE | 05-31-2015 | 08-03-2015 |
| VVM | C | SHU-ACE GED MATH | 05-31-2015 | 08-03-2015 |
| VVM | C | SHU-ACE LITERATURE AND ARTS | 05-31-2015 | 08-03-2015 |
| VVM | C | SHU-ACE PARENTING | 05-31-2015 | 07-10-2015 |
| VVM | C | BEGINNERS SAXOPHONE CLASS | 05-02-2015 | 06-06-2015 |
| VVM | C | BEGINNERS MUSIC THEORY CLASS | 05-02-2015 | 06-06-2015 |
| VVM | C | RAISING CAPITAL: WED., 6:30 PM | 03-12-2015 | 05-14-2015 |
| VVM | C | INSPIRE PARENTING, 8-10AM, WED | 10-23-2014 | 03-20-2015 |
| VVM | C | ADVANCED CROCHET CLASS | 12-20-2014 | 03-07-2015 |
| VVM | C | LEADERSHIP CHALLENGE ACE CLASS | 11-30-2014 | 01-01-2015 |
| VVM | C | GED 4, 1:30 - 3:00 P.M., M-F | 10-16-2014 | 12-18-2014 |
| VVM | C | VT SERVSAFE, 1:30-3:00 PM, M-F | 08-21-2014 | 10-30-2014 |
| VVM | W | GED 2, 9:00 - 10:30 A.M., M-F | 01-31-2014 | 10-16-2014 |
| VVM | C | TYPING, 1:30 - 3:00 PM, M-F | 07-09-2014 | 09-05-2014 |
| VVM | C | SPANISH, TUE., 6:30 P.M. | 07-03-2014 | 09-04-2014 |
| VVM | C | FUNDAMENTAL OF MATH ACE SUN 12 | 04-08-2014 | 06-10-2014 |
| VVM | C | BEGINNERS CROCHET CLASS | 04-20-2014 | 05-25-2014 |
| VVM | C | POETRY CLASS, WED., 6:30 P.M. | 01-15-2014 | 03-19-2014 |
| VVM | C | EMBRACING DIVERSITY | 03-04-2014 | 03-04-2014 |
| VVM | C | BEGINNERS CROCHET CLASS | 10-18-2013 | 11-22-2013 |
| VVM | C | BEGINNERS SAXOPHONE CLASS | 08-06-2013 | 09-10-2013 |
| VVM | C | RPP FCC AIDS AWARENESS (C1) | 06-07-2013 | 06-07-2013 |

### Education Information Summary

he has participated in several classes.

### Discipline Reports

| Hearing Date | Prohibited Acts |
|--------------|-----------------|
| 03-27-2019 | 297 : PHONE ABUSE-DISRUPT MONITORING |
| 04-16-2017 | 306 : REFUSING WORK/PGM ASSIGNMENT |
| 04-10-2017 | 306 : REFUSING WORK/PGM ASSIGNMENT |
| | 307 : REFUSING TO OBEY AN ORDER |
| 04-02-2017 | 306 : REFUSING WORK/PGM ASSIGNMENT |
| | 307 : REFUSING TO OBEY AN ORDER |
| 06-08-2015 | 218 : BRIBING OFFICIAL, STAFF MEMBER |
| 08-27-2014 | 397 : PHONE ABUSE - NO CIRCUMVENTION |
| 08-12-2013 | 307 : REFUSING TO OBEY AN ORDER |

### Discipline Summary

He has received several incident reports with the most recent one being in 2019.



**Summary Reentry Plan - Progress Report**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: MUJAHIDH, WALLI  40738-086

SEQUENCE: 00132446
Report Date: 09-19-2019

## ARS Assignments

| Facl | Assignment | Reason | Start | Stop |
|------|-----------|--------|-------|------|
| EST | A-DES | TRANSFER RECEIVED | 10-31-2017 | CURRENT |
| FLP | A-DES | TRANSFER RECEIVED | 08-13-2015 | 10-20-2017 |
| VVM | A-DES | US DISTRICT COURT COMMITMENT | 05-24-2013 | 07-23-2015 |

## Current Care Assignments

| Assignment | Description | Start |
|-----------|-------------|-------|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 06-22-2011 |
| CARE2-MH | CARE2-MENTAL HEALTH | 07-17-2013 |

## Current Medical Duty Status Assignments

| Assignment | Description | Start |
|-----------|-------------|-------|
| NO PAPER | NO PAPER MEDICAL RECORD | 06-22-2011 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 07-05-2011 |
| YES F/S | CLEARED FOR FOOD SERVICE | 10-19-2016 |

## Current PTP Assignments

| Assignment | Description | Start |
|-----------|-------------|-------|
| RDBTINCOMP | RESOLVE PHASE 2 DBT INCOMPLETE | 03-16-2017 |
| RP1 COMP | RESOLVE PHASE ONE COMPLETED | 12-16-2016 |
| RSW COMP | RESOLVE WORKSHOP COMPLETED | 05-03-2016 |

## Current Drug Assignments

| Assignment | Description | Start |
|-----------|-------------|-------|
| DAP REFER | DRUG ABUSE PROGRAM REFER | 11-02-2017 |
| ED COMP | DRUG EDUCATION COMPLETE | 10-16-2018 |
| NR COMP | NRES DRUG TMT/COMPLETE | 06-22-2018 |

## Physical and Mental Health Summary

He does not have any known medical issues.

## FRP Details

Most Recent Payment Plan

**FRP Assignment:  COMPLT   FINANC RESP-COMPLETED   Start: 03-18-2017**
**Inmate Decision:  AGREED   $25.00   Frequency: QUARTERLY**
**Payments past 6 months:   $0.00   Obligation Balance: $0.00**

### Financial Obligations

| No. | Type | Amount | Balance | Payable | Status |
|-----|------|--------|---------|---------|--------|
| 1 | ASSMT | $300.00 | $0.00 | IMMEDIATE | COMPLETEDZ |

*** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ***

## Financial Responsibility Summary

He has completed his financial obligation through the inmate financial responsibility program.

## Release Planning

He was sentenced to 204 months. He plans to reside with his mother in Las Vegas, Nevada.

## General Comments

** No notes entered **

**U. S. Department of Justice**
*Federal Bureau of Prisons*
*Federal Correctional Institution*
*Post Office Box 699*
*Estill, South Carolina 29918*

*Office of the Chief Psychologist*

September 16, 2019

RE: Mr. Walli Mujahidh (Federal Register No.: 40738-086)

To Whom It May Concern,

Mr. Walli Mujahidh has been incarcerated at the Federal Correctional Institution-Estill, SC since October 31, 2017. Since that time, Mr. Mujahidh has completed the following programming through the Psychology Services department: 1) Non-residential Drug Abuse Program; 2) Drug Education; 3) Illness Management and Recovery group; 4) Changing Criminal Thinking and Victim Impact peer support group; and 5) numerous self-study/self-improvement workbooks. Just prior to his relocation at FCI-Estill, Mr. Mujahidh successfully completed Phase 1 of the Resolve-Seeking Strength (trauma anxiety management) group.

Mr. Mujahidh has repeatedly reported his interest in changing dysfunctional behaviors that he believes contributed to his incarceration. He has routinely expressed his interest in seeking this change through the use of mental health treatment programs.

Sincerely,

R. Binford, Ph.D.
Chief Psychologist
FCI-Estill